United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| COURTNEY COOK,<br>Plaintiff,<br>v.<br>THE REGENTS OF THE UNIVERSITY OF CALIFORNIA,<br>Defendant. | Case No. 24-cv-07444-KAW<br>**ORDER GRANTING MOTION FOR SUMMARY JUDGMENT**<br>Re: Dkt. No. 41 |

Plaintiff Courtney Cook filed the instant action against Defendant The Regents of the University of California, alleging that she was wrongfully terminated in violation of the Americans with Disability Act ("ADA") and the Family and Medical Leave Act ("FMLA"). (*See* Compl., Dkt. No. 1-1.) Pending before the Court is Defendant's motion for summary judgment. (Def.'s Mot. for Summ. J., Dkt. No. 41.)

Having reviewed the parties' filings, the relevant legal authorities, and the arguments made at the July 16, 2026 hearing, the Court GRANTS Defendant's motion for summary judgment.

## I. BACKGROUND

From September 2008 to April 2024, Defendant employed Plaintiff as a Registered Nurse, Nurse Coordinator, Clinical Nurse 3 ("CN3") at UC San Francisco Medical Center's ("UCSF Medical") Thoracic Department. (Murphy Decl., Exh. A ("Cook Depo. Vol. I") at 67:6-21, Dkt. No. 43-1; Cook Decl. ¶ 3, Dkt. No. 48-3.) In this position, Plaintiff worked at least 32 hours per week (80% of a full-time equivalent schedule). (*See* Cook Depo. Vol. I at 98:25-99:6.) Plaintiff's responsibilities included patient teaching, patient assessment, triage, symptom management, treatment administration, monitoring of patient compliance with treatment plans, documentation in the electronic health record, safety and infection-control compliance, collaboration with members

of the practice team to coordinate patient care, and staff training. (Davis Decl. ¶ 3, Dkt. No. 42; Cardozo Decl. ¶ 2, Dkt. N. 45; Cook Decl. ¶ 15.)

Per Plaintiff's supervisor, Associate Clinical Director Shaterra Davis, regular on-site presence is necessary, as some patient care treatment or needs can only be performed or effectively performed in-person. (Davis Decl. ¶ 4.) This includes having personal interactions with patients and their families, using medical equipment, and providing patient continuity and teamwork. (Davis Decl. ¶ 4; Cardozo Decl. ¶ 3.) CN3 nurses also provide immediate in-person treatment during medical emergencies, such as if a patient passes out, reports pain, unexpectedly starts bleeding, or cannot breathe. (Davis Decl. ¶ 4; Cardozo Decl. ¶ 3.) Further, a CN3 uses physical medical equipment to deliver patient care, including evaluating a patient's breathing or vital signs, passing equipment to a surgeon during a Thoracentesis procedure, and performing post-surgical care such as assessing, treating, and evaluating wounds or changing wound dressings. (Davis Decl. ¶ 4.) Shayne Cardozo, another CN3 in the Thoracic Department, likewise understood the Thoracic Department to require on-site attendance at least 50% of the time, and believed this was essential to the CN3 position. (Cardozo Decl. ¶ 2.)

The Thoracic Department employed two CN3s -- Plaintiff and Shayne Cardozo -- who supported five to six surgeons. (Cook Depo. Vol. I at 98:18-24, 106:8-108:8; Cardozo Decl. ¶ 5.) In June 2021, Plaintiff suffered from a life-threatening potassium level. (Cook Depo. Vol. I at 158:3-7.) Plaintiff's doctor, Dr. Sarah French, recommended that she be on leave until July 6, 2021, at which point she could return to remote work if improved. (Cook Depo. Vol. I at 4-10; Dillon Decl., Exh. 14, Dkt. No. 44.) Defendant granted the request for leave; Plaintiff also used some of her vacation time. (Cook Depo. Vol. I at 163:11-17; Cook Decl. ¶ 24.)

On June 30, 2021, Plaintiff provided a doctor's note from Dr. French, stating that Plaintiff was only capable of returning to work remotely on July 6, 2021. (Dillon Decl., Exh. 15.) After conferring with Plaintiff about her work restrictions and health status, Ms. Davis offered Plaintiff a hybrid schedule where she could work remotely on 60% of her shifts and 50% onsite on certain days and times. (Davis Decl. ¶ 8; *see* Cook Depo. Vol. I at 172:1-4.) Plaintiff agreed to the accommodation, which was documented in a Telework Agreement signed by Plaintiff on July 26,

2021. (Davis Decl. ¶ 8, Exh. 16.) Between July 7, 2026 and August 14, 2021, Plaintiff took intermittent leave under the FMLA and COVID-19 Emergency Paid Sick Leave. (*See* Dillon Decl., Exh. A at 3.)

From August 13, 2021 to September 27, 2021, Plaintiff again requested additional FMLA leave, which was granted. (*See* Cook Depo. Vol. I at 198:17-22, 199:7-10.) Dr. French's FMLA certification indicated that Plaintiff was "<u>unable</u> to perform one or more of the essential functions of his/her position due to a condition" until February 1, 2022. (Dillon Decl., Exh. 20.) Thereafter, Plaintiff was permitted to work remotely from September 28, 2021 to February 1, 2022; on the days Plaintiff was scheduled to work onsite, Plaintiff was permitted to take off those days. (Cook Depo. Vol. I at 210:16-20; Davis Decl. ¶ 11.) Notably, Plaintiff was granted this accommodation even though Plaintiff's FMLA leave was exhausted on October 11, 2021. (Cook Depo. Vol. I at 210:24-211:10, 211:19-212:4; Dillon Decl., Exh. 25.)

While Plaintiff was absent and/or working remotely, Ms. Cardozo stated that she would often absorb Plaintiff's job duties on top of her already busy workload, which was very difficult on her. (Cardozo Decl. ¶ 5.) Although UCSF Medical had a "float pool" of nurses who could provide temporary coverage in limited circumstances or emergencies, the float pool was shared by the entire UCSF Medical Cancer Center. (Davis Decl. ¶ 5.) Thus, the float pool could not guarantee coverage or that the same nurse would always be assigned to the Thoracic Department when coverage was needed. (Davis Decl. ¶ 5.) Due to Plaintiff's absences and "remote work only" restriction starting in June 2021, the float pool became strained. (Davis Decl. ¶ 5.)

As reflected by Plaintiff's own experience, nurses needed specific training with thoracic in the Thoracic Department, and there were many times when there was not an available float pool nurse with that training. (Murphy Decl., Exh. B ("Cook Depo. Vol. II") at 332:18-334:16.) Thus, Ms. Cardozo states that even when a float pool nurse was available to cover for Plaintiff, her workload still increased because float nurses generally did not have specialized experience in thoracic. (Cardozo Decl. ¶ 5.) Ms. Cardozo received complaints from patients who were frustrated with the float nurses, and personally observed a lack of continuity among patients, staff, and doctors. (Cardozo Decl. ¶ 5.) Ms. Cardozo also complained to Ms. Davis about the

United States District Court
Northern District of California

difficulties of taking on Plaintiff's duties and how Plaintiff's physical absences affected her. (Cardozo Decl. ¶ 6.; Davis Decl. ¶ 6) Ms. Davis likewise received complaints from doctors about once a week about Plaintiffs' remote work negatively affecting patient continuity, including doctors stating that Plaintiff was not communicating effectively with other team members. (Davis Decl. ¶ 6.) In January 2022, Defendant hired another CN3, Sarah Stallone-O'Brien, who Plaintiff acknowledges took over Plaintiff's on-site duties. (Cook Depo. Vol. II at 415:17-21 (stating that Ms. Stallone-O'Brien took over Plaintiff's on-site responsibilities); Cook Decl. ¶ 34 ("I did not work in Thoracic Surgery for any set part of time after Sarah Stallone O'Brien started.").)

On January 20, 2022, Plaintiff e-mailed a doctor's note recommending that Plaintiff continue to work only remotely from February 1, 2022 through August 1, 2022. (Davis Decl. ¶ 12.) Defendant granted the request. (Cook Depo. Vol. I at 227:7-20.) Because the Thoracic Department did not have enough remote work for Plaintiff to perform full time, Ms. Davis signed a Transitional Work Plan on March 8, 2022 for Plaintiff to perform remote work for the Berkeley Outpatient Center, as well as one shift per week in the Thoracic Department. (Davis Decl. ¶ 13, Exh. 31; Cook Depo. Vol. I at 235:18-236:4, 237:11-18.)

On June 21, 2022, Plaintiff's doctor requested that Plaintiff be placed on disability leave until September 21, 2022. (Cook Depo. Vol. I at 239:40:11; Dillon Decl., Exh. 32.) By June 29, 2022, however, Plaintiff had exhausted her FMLA leave. (Cook Depo. Vol. I, Exh. 33.) Despite that, Plaintiff's request for leave was granted. (Cook Depo. Vol. I at 247:10-13.) On September 7, 2022, Plaintiff's doctor stated that Plaintiff could return to work after September 21, 2022, but only for remote work. (Cook Depo. Vol. I at 248:18-3, Exh. 36.) The remote work accommodation was granted. (Cook Depo. Vol. I at 249:4-6.) Additionally, from January 3, 2023 to January 12, 2023, Defendant granted Plaintiff's COVID-19 emergency paid sick leave. (Dillon Decl., Exh. A at 9.)

On March 31, 2023, Plaintiff's doctor requested that Plaintiff be placed on disability leave from April 3, 2023 through June 5, 2023. (Davis Decl., Exh. 42.) The leave was granted. (Cook Depo. Vol. I at 264:19-22.) On May 3, 2023, Plaintiff's doctor found that Plaintiff could return to work on May 9, 2023, but that "[i]t would be helpful, but not mandatory, that she work remotely

until June 20, 2023 when her mother will be completing her cancer treatments." (Davis Decl., Exh. 43.) Defendant thus permitted Plaintiff to work remotely in the endocrine department. (Cook Depo. Vol. II at 369:22-370:7.)

Between June 20, 2023 and July 13, 2023, Plaintiff took unpaid leave -- including unauthorized leave -- and time off to care for her mother. (Cook Depo. Vol. I at 266:4-6; Dillon Decl., Exh. A at 11; Cook Decl. ¶¶ 25-27.) On July 14, 2023, Ms. Davis e-mailed Plaintiff about her expectation that Plaintiff return to work onsite on Monday, July 17, 2023. (Davis Decl. ¶ 14, Exh. 46.) Plaintiff did not return to work. Instead, on July 22, 2023, Plaintiff requested time off from July 22, 2023 through July 28, 2023 because Plaintiff had received emergency hospital treatment in Florida that precluded her from travelling. (Davis Decl. ¶ 14; Cook Depo. Vol. II at 384:5-385:18, Exh. 47.) Ms. Davis permitted Plaintiff the leave. (Davis Decl. ¶ 14.)

Plaintiff returned to work after the travel restriction expired, but broke her foot less than a week later on August 3, 2023. (Cook Depo. Vol. II at 389:14-15; Cook Decl. ¶ 35.) On August 8, 2023, she requested leave until November 8, 2023. (Cook Depo. Vol. II at 389:16-25, Exh. 48.) Defendant again granted the leave of absence. (Cook Depo. Vol. II at 390:8-10.) On October 26, 2023, Plaintiff submitted a doctor's note requesting that her leave be extended through November 27, 2023. (Cook Depo. Vol. II at 391:5-16, Exh. 49.) Defendant granted the leave of absence. (Cook Depo. Vol. II at 391:17-19.) On October 30, 2023, Plaintiff submitted another's doctor note requesting that her leave be extended to February 3, 2024. (Cook Depo. Vol. II at 392:14-393:3, Exh. 51.)

By this point, Plaintiff had been on leave or was working remotely since June 2021 (almost two and a half years). Given Plaintiff's request for extended leave, the extensive accommodations provided since June 2021, and the resulting operational challenges, Ms. Davis was concerned whether Plaintiff's requested leave would allow her to maintain regular, in-person attendance if she returned to work in February 2024. (Davis Decl. ¶ 16.) Accordingly, on December 15, 2023, Ms. Davis requested that Principal Deputy Analyst, Disability Management Services Laura Dillon review the interactive process undertaken to that point and assess the next steps concerning Plaintiff's employment. (Davis Decl. ¶ 16; Dillon Decl. ¶ 30.)

While Ms. Dillon was preparing the review, Plaintiff submitted a doctor's note dated January 9, 2024, requesting that Defendant again extend Plaintiff's leave to May 8, 2024. (Dillon Decl., Exh. 54.) On January 11, 2024, Ms. Dillon submitted a report to Ms. Davis entitled "Disability Management Review of Proposed Medical Separation of Courtney Cook" ("DMR Report"). (Dillon Decl. ¶ 32, Exh. 55 ("DMR Report").) In this review, Ms. Dillon found that Plaintiff had "only been available to work less than 35% of her 80% Clinical Nurse appointment." (DMR Report at 2.) She further found that the Thoracic Department had "experienced delays in patient care resulting from pulling other medical professionals from their roles to cover for direct patient care tasks that cannot be completed remotely. Even more significant impacts to patient care were seen when [Plaintiff] was not available to perform work, even remote work, during regular intervals of medical leave." (DMR Report at 2-3.) Based on the history of Plaintiff's work restrictions and leave, Ms. Dillon concluded that there was "no reasonable expectation that [Plaintiff[ will be able to reliably perform her essential job functions on a regular and consistent basis," and there were no additional reasonable accommodations that could permit Plaintiff "to perform the essential functions of her role as Clinical Nurse in Thoracic Surgical Oncology." (DMR Report at 3.) Thus, Ms. Dillon recommended a medical separation. (DMR Report at 3.)

On January 30, 2024, Ms. Davis notified Plaintiff of Defendant's intent to medically separate her from employment via letter and e-mail. (Davis Decl. ¶ 18.) Prior to this decision, Plaintiff's treating physician was not contacted and Defendant did not provide Plaintiff with a list of vacant positions or ask that Plaintiff identify positions that she could perform. (Cook Decl. ¶¶ 12, 52-54.) After Plaintiff appealed the decision, Program Manager of Pediatric Outreach Education Laura Bellingham conducted a *Skelly* hearing, at which Plaintiff participated. (Cook Depo. Vol. II at 516:7-14.; Cook Decl. ¶ 62.) On March 15, 2024, Ms. Bellingham recommended that the reasons for the medical separation were supported by the documents and consistent with policy. (*See* Davis Decl., Exh. 61.) On March 26, 2024, Ms. Davis notified Plaintiff that she would be medically separated, effective April 2, 2024. (Davis Decl. ¶ 19, Exh. 61.)

On September 25, 2024, Plaintiff filed the instant case, asserting: (1) violation of the ADA, (2) violation of the FMLA, and (3) wrongful termination and retaliation. (Compl. at 3-4.)

Plaintiff requested the following relief: (1) general damages, (2) compensatory damages, (3) reasonable attorney's fees, (4) costs, and (5) for such other relief as may be proper. (Compl. at 4.)

On June 11, 2026, Defendant filed the instant motion for summary judgment. On June 25, 2026, Plaintiff filed an opposition. (Pl.'s Opp'n, Dkt. No. 48.) On July 2, 2026, Defendant filed a reply. (Def.'s Reply, Dkt. No. 52.)

## II. LEGAL STANDARD

A party may move for summary judgment on a "claim or defense" or "part of... a claim or defense." Fed. R. Civ. P. 56(a). Summary judgment is appropriate when, after adequate discovery, there is no genuine issue as to material facts and the moving party is entitled to judgment as a matter of law. *Id.*; *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Material facts are those that might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.*

A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion, and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. *Celotex,* 477 U.S. at 323. Where the moving party will have the burden of proof at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. *Southern Calif. Gas. Co. v. City of Santa Ana,* 336 F.3d 885, 888 (9th Cir. 2003).

On an issue where the nonmoving party will bear the burden of proof at trial, the moving party may discharge its burden of production by either (1) "produc[ing] evidence negating an essential element of the nonmoving party's case" or (2) after suitable discovery "show[ing] that the nonmoving party does not have enough evidence of an essential element of its claim or defense to discharge its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd., v. Fritz Cos., Inc.*, 210 F.3d 1099, 1103 (9th Cir. 2000); *see also Celotex*, 477 U.S. 324-25.

Once the moving party meets its initial burden, the opposing party must then set forth specific facts showing that there is some genuine issue for trial in order to defeat the motion. *See* Fed. R. Civ. P. 56(e); *Anderson,* 477 U.S. at 250. "A party opposing summary judgment may not

simply question the credibility of the movant to foreclose summary judgment. *Anderson,* 477 U.S. at 254. "Instead, the non-moving party must go beyond the pleadings and by its own evidence set forth specific facts showing that there is a genuine issue for trial." *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 997 (9th Cir. 2001) (citations and quotations omitted). The non-moving party must produce "specific evidence, through affidavits or admissible discovery material, to show that the dispute exists." *Bhan v. NMS Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991). Conclusory or speculative testimony in affidavits and moving papers is insufficient to raise a genuine issue of material fact to defeat summary judgment. *Thornhill Publ'g Co., Inc. v. Gen. Tel. & Electronics Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

In deciding a motion for summary judgment, a court must view the evidence in the light most favorable to the nonmoving party and draw all justifiable inferences in its favor. *Anderson,* 477 U.S. at 255; *Hunt v. City of Los Angeles,* 638 F.3d 703, 709 (9th Cir. 2011).

## III. DISCUSSION

### A. Evidentiary Objections

Separately from its reply, Defendant filed evidentiary objections. This violates Civil Local Rule 7-3(c), which requires that "[a]ny evidentiary and procedural objections to the opposition must be contained within the reply brief or memorandum." Accordingly, the Court STRIKES Defendant's objections as improper. *See Winter v. Jaguar Land Rover N. Am., LLC*, No. 26-cv-01580-NW, 2026 U.S. Dist. LEXIS 143996, at *11 (N.D. Cal. June 29, 2026) (striking separately filed objections as improper under Civil Local Rule 7-3(c)).

### B. Immunities

Defendant contends that each of Plaintiff's claims fail as a matter of law due to federal and state immunity.

#### i. ADA Claim

First, Defendant argues that it is immune from Plaintiff's ADA claim under the Eleventh Amendment. (Def.'s Mot. for Summ. J. at 11.) In general, an action brought "by reason of the State's failure to comply with the provisions of Title I of the [ADA] are barred by the Eleventh Amendment." *Bd. of Trs. v. Garrett*, 531 U.S. 356, 360 (2001). Further, because "[t]he

University of California and the Board of Regents are considered to be instrumentalities of the state," Defendant "enjoy[s] the same immunity as the state of California." *BV Eng'g v. Univ. of Cal.*, 858 F.2d 1394, 1395 (9th Cir. 1988).

Plaintiff does not dispute that Defendant is entitled to sovereign immunity.[1] (Pl.'s Opp'n at 10.) Instead, Plaintiff argues that she can still seek prospective injunctive relief under *Ex parte Young*, such as reinstatement, an order requiring compliance with federal disability law, and a renewed interactive process. (*Id.* at 10-11.) Plaintiff, however, did not request injunctive relief. Rather, Plaintiff's complaint is titled "Complaint for Damages," and seeks only monetary relief. (*See* Compl. at 1, 4.) While Plaintiff prays "[f]or such other relief as the Court may deem meet [sic] and proper," this boilerplate language does not constitute a valid request for injunctive relief. (*See Vargas v. City of L.A.*, No. 2:16-cv-08684-SVW-AFM, 2020 U.S. Dist. LEXIS 259510, at *29 (C.D. Cal. Feb. 18, 2020) (finding no request for injunctive relief where the "complaint is titled a 'Complaint for Damages,' and his complaint is entirely based on compensatory relief" even though the plaintiff also prayed "for any and all other relief to which he may be entitled"); *Int'l Tech. Univ. Found. v. WASC Senior Coll. & Univ. Comm'n*, No. 22-cv-04576-BLF, 2023 U.S. Dist. LEXIS 49622, at *7 (N.D. Cal. Mar. 23, 2023) (finding that the court lacked authority to grant injunctive relief where the complaint only sought damages). Moreover, "*Ex parte Young* permits suit against individual state officers, not against the state or arm of the state." *Mallery v.*

[1] At oral argument, Plaintiff changed course and argued that Defendant had waived sovereign immunity by removing the case to federal court. Plaintiff, however, never argued waiver in the opposition brief. Courts have found that "arguments made for the first time at oral argument are deemed waived." *Sloan v. GM LLC*, No. 16-cv-07244-EMC, 2020 U.S. Dist. LEXIS 167905, at *18 (N.D. Cal. Sep. 14, 2020); *Booth v. United States*, 914 F.3d 1199, 1206 (9th Cir. 2019) (finding that an argument raised for the first time at oral argument was waived"). Here, it would be "unfair and prejudicial" to allow Plaintiff "to raise new arguments and authorities for the first time at oral argument, taking the opposing party by surprise and affording no opportunity to respond whatsoever." *Acasio v. Lucy*, No. 14-cv-04689-JSC, 2017 U.S. Dist. LEXIS 54692, at *29 (N.D. Cal. Apr. 10, 2017). This is especially the case where it appears that courts have found that removal to federal court waives sovereign immunity from suit "while retaining immunity from liability for monetary damages." *Trant v. Oklahoma*, 754 F.3d 1158, 1172 (10th Cir. 2014); *Redgrave v. Ducey*, 953 F.3d 1123, 1125 (9th Cir. 2020) ("the several circuits to share *Walden*'s conclusion all hold that removal merely waives immunity from suit but not the defense of immunity from liability"). In other words, the waiver issue is not straightforward, highlighting the significant prejudice and unfairness to Defendant should the Court consider the issue after Plaintiff failed to raise it in the opposition brief. The Court thus concludes that the waiver issue is waived.

*Cal. Comm'n on Judicial Performance*, No. 25-cv-07715-EMC, 2026 U.S. Dist. LEXIS 28808, at *26 (N.D. Cal. Feb. 11, 2026). Here, Plaintiff has sued only Defendant UC Regents, *i.e.*, an instrumentality of the State of California.

To the extent Plaintiff suggests the Court give leave to amend the complaint, Plaintiff provides no explanation for how she would meet Rule 16's good cause requirement (particularly diligence). (*See* Pl.'s Opp'n at 11.) Here, Defendant raised its affirmative defense of sovereign immunity in its October 24, 2024 answer, Plaintiff's last day to seek leave to amend the pleadings was March 28, 2025, and Defendant provided Plaintiff with its legal authority regarding immunity in its March 17, 2026 settlement conference statement. (*See* Dkt. No. 1-2 ("Answer") ¶¶ 28, 29; Dkt. No. 11; 7/2/26 Murphy Decl., Exh. C at 9, Dkt. No. 52-1.) Under such circumstances, it is simply not apparent how Plaintiff can establish diligence. *See Johnson v. Mammoth Recreations*, 975 F.2d 604, 608 (9th Cir. 1992); *Parapluie, Inc. v. Mills*, 555 F. App'x 679, 682-83 (9th Cir. 2014) (finding that the district court did not abuse its discretion by denying leave to amend when the plaintiff requested in its opposition to summary judgment to amend the complaint to add claims seven months after the deadline for amendment had passed); *Est. of Marrufo v. City of Bakersfield*, No. 1:24-cv-00274-CDB, 2025 U.S. Dist. LEXIS 227997, at *13 (E.D. Cal. Nov. 19, 2025) (denying motion to amend complaint for lack of diligence where the plaintiff filed the motion one year after the issue of another plaintiff needing to be added was raised).[2]

Accordingly, the Court finds that Plaintiff's ADA claim is barred by the Eleventh Amendment.

**ii. FMLA**

Second, Defendant argues that the FMLA claim is likewise barred by the Eleventh Amendment. (Def.'s Mot. for Summ. J. at 11.) Plaintiff does not dispute that the Eleventh Amendment applies to her FMLA claim to the extent such claim concerns Plaintiff taking leave to care for herself. (Pl.'s Opp'n at 11; *see Coleman v. Court of Appeals*, 566 U.S. 30, 37 (finding

[2] At the hearing, Plaintiff appeared to argue that she did not amend the complaint to include any individuals because such individuals could not be sued with respect to her state claim, but this is irrelevant to why she did not previously amend the complaint to add the individual defendant needed for prospective relief under her *federal* ADA claim.

that the FMLA's "self-care provision is not a valid abrogation of the States' immunity from suit").) Rather, Plaintiff argues that the Eleventh Amendment does not bar FMLA claims for money damages based on violations of the family-care leave provision. (Pl.'s Opp'n at 11; *see Coleman*, 566 U.S. at 36 (explaining that employees were permitted to recover damages for violations of the FMLA's family-care leave provisions).) Thus, Plaintiff argues that her FMLA claim survives to the extent it is based on Plaintiff taking leave to care for her mother in 2023. (Pl.'s Opp'n at 11.)

As with the ADA claim, the fundamental problem with Plaintiff's argument is that it is not grounded in the operative complaint. Rather, Plaintiff's complaint makes clear that the FMLA claim is based on Plaintiff "t[akinig] multiple leaves of absence for medical reasons related to COVID-19 and vaccine side effects," such that the "terminat[ion of] her employment while she was still under active medical treatment and preventing her from returning to work on her doctor-ordered return date could be seen as retaliation and interference with her FMLA rights." (Compl. at 3-4.) Plaintiff's second cause of action for a FMLA violation does not refer to Plaintiff's leave to care for her mother. (*See id.*) In short, Plaintiff is once again relying on a claim that has not been brought.

At the hearing, Plaintiff acknowledged that she did not bring a claim based on caring for her mother but argued that such a claim came through her deposition. When pressed for authority for allowing a claim to go forward without being in the complaint, however, Plaintiff could not identify any such authority. Meanwhile, courts have been clear that a plaintiff "cannot pursue a claim not pled in her complaint." *Williams v. Lorenz*, No. 15-cv-04494-BLF, 2018 U.S. Dist. LEXIS 142967, at *61-62 (N.D. Cal. Aug. 22, 2018); *see also Hasan v. E. Wash. State Univ.*, 485 F. App'x 169, 171 (9th Cir. 2012) (finding that the plaintiff failed to preserve a hostile work environment claim because "[t]hat claim was not pled in [the] complaint and was raised for the first time in [the] opposition to Defendants' motion for summary judgment").

In any case, as discussed in detail below, any claim based on Plaintiff taking leave in 2023 to care for her mother would fail because there is no genuine factual dispute that Plaintiff's FMLA leave was exhausted by June 2022. Thus, Plaintiff did not take use FMLA leave to care for her

mother, and there is no basis for money damages based on Plaintiff's use of the family-care leave provision.

Accordingly, the Court finds that Plaintiff's FMLA claim is barred by the Eleventh Amendment.

**iii. Wrongful Termination and Retaliation**

Finally, Defendant argues that the wrongful termination and retaliation claim fails because Defendant is immune pursuant to California Government Code § 815. (Def.'s Mot. for Summ. J. at 12.) As confirmed by the California Supreme Court, "section 815 abolishes common law tort liability for public entities." *Miklosy v. Regents of Univ. of Cal.*, 44 Cal. 4th 876, 899 (2008). This includes claims for wrongful termination. *See Ross v. S.F. Bay Area Rapid Transit Dist.*, 146 Cal. App. 4th 1507, 1513-14 (2007) (explaining that a public entity was immune from a wrongful termination claim because a public entity cannot have direct liability except as provided by statute).

In response, Plaintiff argues that § 815 does not bar the wrongful termination claim because it is grounded in the ADA and the FMLA. (Pl.'s Opp'n at 12.) Plaintiff cites no authority for the proposition that a wrongful termination claim can survive depending on the underlying public policy at issue. In fact, "multiple courts applying California law have held that a complaint's citation to a statutory provision does not transform a common law cause of action for wrongful termination in violation of public policy into a statutory cause of action." *Madani v. Cty. of Santa Clara*, No. 16-CV-07026-LHK, 2017 U.S. Dist. LEXIS 42694, at *26 (N.D. Cal. Mar. 23, 2017); *see also Ortiz v. Lopez*, 688 F. Supp. 2d 1072, 1079 (E.D. Cal. 2010) ("That Plaintiff cites [statutory] sections in his [wrongful termination] cause of action, however, does not change the nature of the claim as a common law tort. Instead, relating the common law claim to a statute is a necessity of the tort itself.").

Accordingly, the Court finds that Plaintiff's wrongful termination and retaliation claim is barred by § 815.

**C. Merits of the Claims**

Although, as discussed above, each of Plaintiff's claims are barred by various immunities,

the Court nevertheless also finds that Defendant is entitled to summary judgment on the merits of each claim.

**i. ADA**

"To establish a prima facie case for failure to accommodate under the ADA, [the plaintiff] must show that (1) she is disabled within the meaning of the ADA; (2) she is a qualified individual able to perform the essential functions of the job with reasonable accommodation; and (3) she suffered an adverse employment action because of her disability." *Samper v. Providence St. Vincent Med. Ctr.*, 675 F.3d 1233, 1237 (9th Cir. 2012) (internal quotation omitted). Further, a reasonable accommodation "[can]not place an undue hardship on the operation of the employer's business." *Snapp v. United Transp. Union*, 889 F.3d 1088, 1095 (9th Cir. 2018).

a. Qualified Individual

"An individual is qualified if with or without reasonable accommodation, she can perform the essential functions of the employment position." *Samper*, 675 F.3d at 1237 (internal quotation omitted). In making this determination, the Court "considers whether the individual can perform the essential functions with or without a reasonable accommodation." *Id.* While the plaintiff has "the burden of proof in making her prima facie case," the employer "has the burden of production in establishing what job functions are essential[.]" *Id.*

Here, Defendant argues that Plaintiff cannot establish that she was able to perform the essential duties of the CN3 position, specifically the requirement of regular in-person attendance. (Def.'s Mot. for Summ. J. at 13.) Courts have found that "[i]t is a rather common-sense idea that if one is not able to be at work, one cannot be a qualified individual." *Samper*, 675 F.3d at 1237 (internal quotation omitted). In *Samper*, the Ninth Circuit found that this "common-sense notion that on-site regular attendance is an essential job function could hardly be more illustrative than in the context of a neo-natal nurse," noting that the plaintiff's job duties include "teamwork, face-to-face interaction with patients and their families, and working with medical equipment." *Id.* at 1238, The work also required "lift[ing] babies, push[ing] cribs and isolettes," and "get[ting] up at a moment's notice to answer alarms and often run to codes." *Id.*

Here, the facts are remarkably similar to *Samper*. Plaintiff's supervisor, Ms. Davis,

explained that regular on-site presence is necessary because some patient care treatment or needs can only be performed in-person, such as having personal interactions with patients and their families, using medical equipment to deliver patient care, providing patient continuity, responding to emergency issues, passing physical equipment to a surgeon during a Thoracentesis procedure, treating and changing wound dressings, and conducting physical evaluations of patients. (Davis Decl. ¶ 4.) The other CN3 nurse, Ms. Cardozo, likewise explained that regular on-site presence is necessary to have personal interactions with patients and their families, using physical medical equipment, providing patient continuity and teamwork among staff, teaching breathing exercises, responding to emergency issues by providing patients with immediate in-person treatment, assisting surgeons, and performing post-surgery treatment. (Cardozo Decl. ¶ 3.) Both Ms. Davis and Ms. Cardozo also identified negative effects from Plaintiff's absence and/or remote work, including receiving complaints from doctors and patients about ineffective communication and difficulties coordinating patient care. (Davis Decl. ¶ 6; Cardozo Decl. ¶ 5.) Both also explain the inadequacy of relying on float pool nurses, with Ms. Cardozo pointing to their lack of specialized experience in thoracic. (Davis Decl. ¶ 5; Cardozo Decl. ¶ 5; *compare with Samper*, 675 F.3d at 1238 (noting that the plaintiff's "regular, predictable presence to perform specialized, life-saving work in a hospital context was even *more* essential than in [other] cases [as t]his is not a job where it possible to argue . . . that workers were basically fungible with one another").

In response, Plaintiff argues that full-time in-person attendance was not an essential function because Defendant previously permitted Plaintiff to work fully remotely and/or hybrid schedules. (Pl.'s Opp'n at 13.) This misapprehends Defendant's argument; Defendant does not state *full-time* in-person attendance was required, but that *regular* in-person attendance was an essential function. Thus, the fact that some of her functions were compatible with remote work is not evidence that regular in-person attendance was not an essential function. Importantly, Plaintiff points to **no** evidence that the in-person responsibilities identified by Ms. Davis and Ms. Cardozo were not a necessary part of her job. For example, Plaintiff does not present any evidence that other CN3 nurses were permitted to work remotely full-time or that her in-person responsibilities were not a significant part of her job.

Further, as the Ninth Circuit pointed out in *Samper*, "the fact that the employer had infinite patience with regard to the employee's poor attendance does not necessarily mean that every company must put up with employees who do not come to work." 675 F.3d at 1240. Likewise, Defendant's numerous attempts to accommodate Plaintiff should not be held against it. Moreover, the evidence in the record shows that the Thoracic Department did not have sufficient remote work to allow Plaintiff to work remotely full time. Rather, during Plaintiff's remote work from September 2021 to February 2022, Plaintiff worked a hybrid schedule where she worked from home 60% of her shifts and 50% onsite on certain days and times; for the days that Plaintiff was scheduled to work onsite, however, Plaintiff was permitted to take off those days. (Davis Decl. ¶¶ 8, 11.) When Plaintiff requested an extension of that remote work accommodation, she performed work for a different department because the Thoracic Department did not have enough remote work for Plaintiff to perform full time. (Davis Decl. ¶ 13.) These averments are uncontradicted.[3]

Accordingly, the Court finds that Plaintiff has failed to establish that she was a qualified individual.

b. Undue Hardship

Additionally, Defendant argues that the accommodations at issue -- remote work and repeated leaves of absence -- were no longer reasonable and imposed an undue hardship on it. (Def.'s Mot. for Summ. J. at 15-16.) Again, Defendant has identified numerous operational difficulties caused by Plaintiff's absence and/or remote work, including Ms. Davis receiving complaints about how Plaintiff's remote work negatively affected patient continuity, Ms. Cardozo receiving complaints from patients about conflicting information being given by float nurses (who generally were not specialized in thoracic), and Ms. Cardozo complaining to Ms. Davis about having to absorb Plaintiff's job duties, thus overburdening her. (Davis Decl. ¶ 6; Cardozo Decl. ¶¶ 5-6.) Likewise, in Ms. Dillon's review, she found that the Thoracic Department had "experienced delays in patient care resulting from pulling other medical professionals from their roles to cover

[3] The Court notes that the only evidence cited by Plaintiff in support of her assertion that she could perform work remotely is paragraphs 36-40 of her declaration, but these paragraphs pertain to Plaintiff's August 3, 2023 injury and subsequent leave request. (*See* Cook Decl. ¶¶ 36-40.)

for direct patient care tasks that cannot be completed remotely. Even more significant impacts to patient care were seen when [Plaintiff] was not available to perform work, even remote work, during regular intervals of medical leave." (DMR Report at 2-3.)

"Plaintiff does not deny that her absences and remote work created operational challenges" (*see* Pl.'s Opp'n at 17), but argues that Defendant managed these challenges for two and a half years, such that Defendant could continue to manage this burden. (Pl.'s Opp'n at 17-18.) Plaintiff's argument is not tethered to any legal authority or factual evidence. For example, Plaintiff cites no evidence, such as deposition testimony or otherwise, that would contradict Defendant's evidence from Ms. Davis and Ms. Cardozo that they struggled with Plaintiff's absences. It is simply not sufficient to make a conclusory argument that a jury "might" be able to find there was no undue hardship; Plaintiff must support the argument with evidence. Similarly, Plaintiff argues that Defendant is a major academic center with multiple departments, so it could have accommodated Plaintiff. (Pl.'s Opp'n at 18.) Again, Plaintiff provides no evidence about Defendant's ability to continue allowing an employee to take leave and/or work remotely after over two and a half years of such accommodations.

Ultimately, this is a case that must be viewed in the context of Plaintiff's accommodation history. By the time Ms. Davis requested that Ms. Dillon review the next steps concerning Plaintiff's employment, Plaintiff had been on leave and/or working remotely for two and a half years, and had submitted another request to extend her leave by an additional two months. (Davis Decl. ¶ 16; Cook Depo. Vol. II, Exhs. 51.) Before Ms. Dillon could complete her review, Plaintiff submitted yet another request to extend her leave by three months. (Dillon Decl., Exh. 54.) In her review, Ms. Dillon found that since Plaintiff first took leave in June 2021, Plaintiff had "only been available to work less than 35% of her 80% Clinical Nurse appointment." (DMR Report at 2.) While Plaintiff now argues that she never requested permanent leave with no endpoint (*see* Pl.'s Opp'n at 14), Plaintiff does not dispute that she had repeatedly requested extensions to leave or other accommodations that effectively prevented her from completing her in-person duties. As the Ninth Circuit found in *Samper*, "despite [the defendant's] patience and accommodations, there was literally nothing in the record to suggest that the future would look different form the past,

leaving [the defendant] with little choice but to terminate [the plaintiff]." 675 F.3d at 1240-41; *see also Horton v. City & Cty. of S.F.*, No. 22-cv-03174-WHO, 2024 U.S. Dist. LEXIS 203520, at *20 (N.D. Cal. Nov. 7, 2024) "(The City extended Horton's leave of absence six times between when Horton first indicated he was disabled and his medical separation. Under the circumstances, it was under no obligation to do more.").

Alternatively, Plaintiff argues that she could have been accommodated with a hybrid schedule or other assignment. (Pl.'s Opp'n at 18.) At the time of her medical separation, however, Plaintiff was not capable of performing any other assignment; rather, her doctor had requested that she "remain out of work" entirely. (*See* Dillon Decl., Exh. 54.) It is unclear what alternative work Plaintiff could possibly have performed when she was not able to work at all. Plaintiff's after the fact assertion that she could perhaps have worked with accommodation is thus contradicted by her own doctor's notes. *Compare with Jackson v. Simon Prop. Grp., Inc.*, 795 F. Supp. 2d 949, 961 (N.D. Cal. 2011) (rejecting the plaintiff's argument that he could have done his job on a part-time basis when the undisputed evidence was that the plaintiff and his doctors had repeatedly informed the plaintiff's employer that he could not work at all).

Accordingly, the Court finds that Defendant has established that further reasonable accommodations imposed an undue hardship on it, such that Plaintiff cannot establish that there was a reasonable accommodation that would allow her to perform her job.

c. Interactive Process

"The Ninth Circuit has held that notifying an employer of a need for an accommodation triggers a duty to engage in an 'interactive process' through which the employer and employee can come to understand the employee's abilities and limitations, the employer's need for various positions, and a possible middle ground for accommodating the employee." *Snapp*, 889 F.3d at 1095. A failure to engage in the interactive process is not a standalone claim; "[r]ather, discrimination results from denying an available and reasonable accommodation." *Id.* In short, "[e]mployers, who fail to engage in the interactive process in good faith, face liability for the remedies imposed by the statute if a reasonable accommodation would have been possible." *Humphrey v. Mem'l Hosps. Ass'n*, 239 F.3d 1128, 1137-38 (9th Cir. 2001).

Here, Plaintiff argues that Defendant failed to continue engaging in the interactive process after October 2023. (Pl.'s Opp'n at 16.) Even if that was the case, this is not a standalone claim. *See Snapp*, 889 F.3d at 1095; *Simmons v. Del Toro*, No. 3:19-cv-01448-RSH-WVG, 2023 U.S. Dist. LEXIS 133454, at *33 (S.D. Cal. Jan. 24, 2023) (explaining that failure to engage in the interactive process "is not a valid theory of liability"); *Ahmed v. Regents of the Univ. of Cal.*, No. 17cv0709-MMA (NLS), 2018 U.S. Dist. LEXIS 141034, at *12 (S.D. Cal. Aug. 20, 2018) ("Failure to engage in the interactive process, however, is not an independent cause of action."). Rather, Plaintiff would still need to identify a feasible reasonable accommodation. *See Humphrey*, 239 F.3d at 1137-38. As discussed above, Plaintiff has failed to identify such a reasonable accommodation. Thus, whether Defendant engaged in the interactive process after October 2023 does not save Plaintiff's ADA claim.

Accordingly, the Court finds that Defendant is entitled to summary judgment on the ADA claim because Plaintiff has failed to make a showing that she is a qualified individual and because Plaintiff has failed to identify a reasonable accommodation that would not impose an undue burden on Defendant.

**ii. FMLA**

The FMLA prohibits an employer from interfering with, restraining, or denying the exercise or attempt to exercise FMLA rights. 29 U.S.C. § 2615(a)(1).

a. Interference with FMLA Leave

"To prevail on a FMLA interference claim, 'the employee must establish that: (1) he was eligible for FMLA's protections, (2) his employer was covered by the FMLA, (3) he was entitled to leave under the FMLA, (4) he was provided sufficient notice of his intent to take leave, and (5) his employer denied him FMLA benefits to which he was entitled.'" *Andrade v. Costco Wholesale Corp.*, No. 23-cv-06125, 2025 U.S. Dist. LEXIS 259107, at *54 (N.D. Cal. Dec. 15, 2025) (quoting *Sanders v. City of Newport*, 657 F.3d 772, 778 (9th Cir. 2011)).

Defendant argues that Plaintiff cannot establish interference with her FMLA leave because Plaintiff exhausted her FMLA eligibility by June 2022. (Def.'s Mot. for Summ. J. at 17.) Thus, by the time of her medical separation in March 2024, she had no FMLA entitlement or benefits, as

United States District Court
Northern District of California

she had not worked enough hours to qualify for FMLA leave. (*See* Dillon Decl., Exhs. 96 (August 10, 2023 letter stating that Plaintiff was not eligible for FMLA leave because she had not worked 1,250 hours in the past 12 months), 97 (December 1, 2023 letter stating that Plaintiff was not eligible for FMLA leave because she had not worked 1,250 hours in the past 12 months).)

Plaintiff does not produce any evidence that she was entitled to FMLA leave after June 2022. Instead, she argues that she is entitled to test Defendant's calculations regarding whether she had exhausted her FMLA eligibility. (Pl.'s Opp'n at 19.) Plaintiff is indeed entitled to do so. The problem, however, is that Plaintiff has not done so. Plaintiff does not present her own calculations or otherwise contradict Defendant's affirmative evidence that she had exhausted her FMLA eligibility. Plaintiff cannot defeat summary judgment by raising the possibility that she test Defendant's calculations; Plaintiff needs to actually do so. Confusingly, at the hearing, Plaintiff argued that the doctor's notes showed her entitlement to FMLA leave, but could not explain how doctor's notes determined Plaintiff's eligibility for FMLA leave (which is dependent on the number of hours worked).

Accordingly, the Court finds that Plaintiff cannot establish a claim based on interference with her FMLA leave.

b. FMLA Retaliation

To establish a *prima facie* case for retaliation under the FMLA, the plaintiff must demonstrate that: "(1) he engaged in a protected activity under the FMLA; (2) he suffered some adverse employment action by the employer following the protected activity; and (3) the adverse employment action was causally linked to the protected activity." *Yphantides v. Cnty. of San Diego*, 660 F.3d 935, 958 (S.D. Cal. 2023) (internal quotation omitted). "In some cases, temporal proximity between the protected activity can, by itself, constitute sufficient circumstantial evidence or an interference of retaliation but it must be close in time." *Id.* at 959. Moreover, "an inference of causation based on temporal proximity is undermined or negated fi intervening events are the reasons for the employer's adverse employment action." *Id.*

Here, Defendant argues that Plaintiff cannot establish a causal connection between her FMLA leave in mid-2021 and her medical separation in April 2024. (Def.'s Mot. for Summ. J. at

17.) In opposition, Plaintiff argues that causation can be shown by Ms. Davis requesting a review of Plaintiff's employment status less than two months after Plaintiff requested leave in late 2023, followed by Ms. Dillon's recommendation that Plaintiff be medically separated less than two days after Plaintiff's January 9, 2024 medical note requesting an extension of leave. (Pl.'s Opp'n at 20.) Indeed, Plaintiff emphasizes that the medical separation process "began only after Plaintiff requested additional leave in late October 2023," such that "[a] jury could view the October 2023 requests as the triggering event[.]" (*Id.* at 21.) Again, the fundamental problem is that Plaintiff's leave after June 2022, including her request for leave in October 2023, was not protected by the FMLA. Plaintiff cannot succeed by demonstrating that the medical separation was the result of the many requests for unprotected leave taken after June 2022. Instead, she must present evidence that there was a causal connection between Plaintiff taking protected FMLA leave and her termination. Plaintiff, however, presents none.

Accordingly, the Court finds that Plaintiff cannot establish a claim for FMLA retaliation.

**iii. Wrongful Termination and Retaliation**

Plaintiff's wrongful termination and retaliation claims are premised on her ADA and FMLA claims, and thus fail for the same reasons that those claims fail. *See Hanson v. Lucky Stores, Inc.*, 74 Cal. App. 4th 215, 229 (1999) (finding that because the underlying statutory claim failed, the plaintiff's "claim for wrongful termination in violation of public policy fails");

## IV. CONCLUSION

To summarize, each of Plaintiff's claims are barred by immunity under the Fourteenth Amendment or California Government Code § 815. Moreover, for the reasons stated above, each of Plaintiff's claims fail on the merits.

Accordingly, the Court GRANTS Defendant's motion for summary judgment.

IT IS SO ORDERED.

Dated: July 17, 2026

KANDIS A. WESTMORE
United States Magistrate Judge